**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| BILLER, | ) | CASE NO:    1:09-cv-1763 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE JAMES S. GWIN |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| MICHAEL J. ASTRUE, | ) | NANCY A. VECCHIARELLI |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | **REPORT & RECOMMENDATION** |

Plaintiff, Dawn D. Biller, challenges the final decision of the Commissioner of

Social Security, Michael J. Astrue (the "Commissioner"), denying Plaintiff's claim for

Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42

U.S.C. § 1381 *et seq*.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This

case is before the undersigned United States Magistrate Judge pursuant to an

automatic referral under Local Rule 72.2(b) for a Report and Recommendation.

For the reasons set forth below, the Magistrate Judge recommends that the final

decision of the Commissioner be VACATED and REMANDED.

## I.    Procedural History

On August 19, 2005, Plaintiff applied for SSI benefits and alleged a disability

onset date of August 1, 2001.  On November 15, 2005, her application was denied and,

on May 23, 2006, her application was denied again upon reconsideration.  On June 21,

2006, Plaintiff requested a hearing before an administrative law judge ("ALJ").  Plaintiff's

hearing was held on August 12, 2008.  Plaintiff's Counsel and a vocational expert ("VE")

were present at the hearing.  On September 29, 2008, the ALJ found Plaintiff not

disabled.  On May 28, 2009, the Appeals Council declined to review the ALJ's Decision.

Plaintiff then timely filed this action in federal court.  (Doc. No. 1.)

Plaintiff asserts three assignments of error, but the arguments in support are far

from being clear.[1]  Liberally construing them, however, leads to the conclusion that

Plaintiff actually raises one main issue:  whether the ALJ failed to meet the

requirements of the Social Security Rulings by failing to articulate the basis of his

Decision with sufficient specificity to make clear to subsequent reviewers the weight he

gave to the record evidence.

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Plaintiff was 27 years old when she filed for disability benefits and 35 years old

at the time of the ALJ's Decision.  (See Tr. 649, 647.)  She had a high school degree.

(Tr. 649.)  Plaintiff worked part-time as a cashier at the time of the hearing.  (Tr. 649.)

---

[1] The government's brief is not at all helpful on this point.  Rather than attempting
to address Plaintiff's individual assignments of error, the Commissioner chose
to redefine Plaintiff's arguments as the sole question of whether substantial
evidence supported the ALJ's Decision.

2

Her past relevant work included jobs as a shoe sales person and dry cleaning counter clerk. (Tr. 664.)

### B. Medical Evidence[2]

It is undisputed that Plaintiff suffers migraine headaches, depression, and obsessive-compulsive disorder ("OCD"). (Tr. 22.) Plaintiff has an extensive history of hospital emergency room treatment for her complaints of migraine headaches. (See Tr. 317-24, 367-74, 383-86.) At issue, however, is the extent to which Plaintiff's impairments limit her ability to work.

Between August 22, 1997, and October 19, 1999, Dr. Stephen C. Wells, M.D., evaluated and treated Plaintiff at the Ashtabula Clinic. (Tr. 398-414.) Plaintiff's complaints included migraine headaches and depression. (Tr. 398, 399, 401, 402, 404, 405, 407, 408, 410.) Dr. Stephen Wells indicated that Plaintiff had a history of migraine headaches (Tr. 408), and diagnosed Plaintiff with depression caused by her recent marital problems (Tr. 404, 405). On several occasions, Dr. Stephen Wells indicated that Plaintiff's migraines lasted for several days at a time. (Tr. 398, 407.) Dr. Stephen Wells

---

[2] The Court is extremely disappointed by the factual presentation of both sides in this matter. Plaintiff's counsel simply submitted in her Brief on the Merits thirteen pages of single-spaced notes on the record evidence, which was unhelpful particularly because it did not meaningfully articulate the facts in relation to the legal arguments. Plaintiff's legal counsel is strongly discouraged from presenting the facts in this manner in the future.

The Commissioner's brief is equally disappointing. The government presented no facts and instead directed the Court's attention to the administrative law judge's Decision and Plaintiff's Brief on the Merits for a "thorough summary" of the facts. Such perfunctory factual references are not acceptable, and the government is strongly discouraged from presenting the facts in this manner in the future.

prescribed Plaintiff medication to alleviate her migraine headache pain and depression. (Tr. 398-99, 402, 403, 405, 408, 410.) On two occasions, Dr. Stephen Wells indicated that Plaintiff was "not doing well." (Tr. 398, 399.)

On December 11, 2000, Dr. Richard V. Wells, M.D., from Northshore Clinical Associates, LLC, evaluated Plaintiff upon referral from Dr. Jonathan Park.[3] (Tr. 593.) Dr. Richard Wells indicated that Plaintiff had a family history of migraines, and that Plaintiff's migraines occurred up to four to five times per week. (Tr. 593.) On March 12, 2001, Dr. Richard Wells noted that Plaintiff was taking medication for obsessive compulsive disorder. (Tr. 592.) There are no notes from Dr. Richard Wells, however, explaining the nature and severity of her obsessive compulsive disorder. (See Tr. 592.)

On January 18, 2002, Dr. Jeffrey J. Esper, D.O., from Northshore Clinical Associates, LLC, evaluated Plaintiff upon referral from Dr. Wes Hilbert.[4] (Tr. 586.) Dr. Esper's evaluation was largely unremarkable. He indicated that Plaintiff suffered headaches consistent with migraines, and that Plaintiff likely also suffered rebound headaches from over-using abortive treatments such as Excedrin Migraine™, Advil Migraine™, and caffeine. (Tr. 587.)

Between 2004 and 2008, Plaintiff saw Douglas K. Franley, M.D., at University Hospitals with complaints of migraine headaches. (Tr. 521-35.) Dr. Franley indicated that Plaintiff had "been seen at some of the most renowned Headache Centers in the country with apparently little benefit." (Tr. 535.) Dr. Franley diagnosed Plaintiff with

---

[3] The record does not indicate Dr. Park's treatment relationship with Plaintiff.

[4] The record does not indicate Dr. Hilbert's treatment relationship with Plaintiff.

4

"severe chronic incapacitating vascular headaches, partially controlled." (Tr. 522.) Dr. Franley indicated that Plaintiff reported suffering headaches two to three times a week while on her medications. (Tr. 521.) Dr. Franley further indicated that Plaintiff did little physical activity because such activity caused her to have headaches. (Tr. 521.)

On July 12, 2004, Dr. Jennifer S. Kriegler, M.D., examined Plaintiff at the American Migraine Center upon referral from Dr. Franley. (Tr. 221-23.) Dr. Kriegler noted Plaintiff's history of migraine headaches and diagnosed Plaintiff with migraine headaches. (Tr. 221, 223.) The examination was otherwise unremarkable, and Dr. Kriegler recommended medication to help control Plaintiff's headaches. (Tr. 221-23.)

In October through November 2004, Plaintiff saw Dr. Robert Kunkle, M.D., at a headache clinic upon referral from Dr. Franley. (Tr. 251.) Dr. Kunkle reported that Plaintiff suffered headaches daily and opined that some of the headaches might be rebound headaches caused by withdrawal from her medications. (Tr. 252.) Dr. Kunkle recommended that Plaintiff take other medications and undergo more aggressive treatment to overcome what he believed was a cycle of withdrawal-based rebound headaches. (Tr. 252.)

Between 2004 and 2005, Plaintiff saw Dr. Matthew Mueller, D.O., who diagnosed Plaintiff with "chronic migraines with evidence of drug-seeking behavior," and prescribed Plaintiff medication to control her headaches. (Tr. 256-63.) Dr. Mueller stopped prescribing Plaintiff medication for her headaches in August 2005, however, because he believed that Plaintiff was "narcotic shopping." (Tr. 256.) He continued to prescribe Plaintiff medication for her depression. (Tr. 256.)

In mid- to late-2005, Plaintiff saw Dr. Dorothy A. Lyons, M.D., upon referral from

5

Dr. Mueller. (Tr. 315.) Dr. Lyons diagnosed Plaintiff with "common migraine headaches" and prescribed new medications to control Plaintiff's headaches. (Tr. 315.) Dr. Lyons reported that Plaintiff suffered headaches every two to three days, with one headache so severe that Plaintiff "lost consciousness transiently." (Tr. 278.) Dr. Lyons recommended changing Plaintiff's medications. (Tr. 278.) Toward the end of Dr. Lyons's treatment relationship with Plaintiff, Dr. Lyons reported that Plaintiff continued to suffer severe headaches every two to three days, had no improvement in her condition, and was "still quite disabled" by her headaches. (Tr. 439.)

On October 17, 2005, clinical psychologist Richard C. Halas, M.A., examined Plaintiff at the request of the Bureau of Disability Determination. (Tr. 325.) Mr. Halas diagnosed Plaintiff with depression and OCD. (Tr. 327.) Mr. Halas gave Plaintiff a global assessment of functioning ("GAF") score of 45, indicating "significant psychological issues."[5] (Tr. 328.) He opined that Plaintiff had marked limitations in her ability to relate to others and withstand the stresses and pressures associated with most day-to-day work settings. (Tr. 328.)

On November 8, 2005, medical consultant Alice Chambly performed a mental residual functional capacity ("RFC") assessment on Plaintiff. (Tr. 329-44.) Ms. Chambly opined that Plaintiff suffered moderate difficulties in maintaining social functioning; mild restrictions in daily activities; mild difficulties in maintaining

---

[5] A GAF score between 41 and 50 indicates serious symptoms or a serious impairment in social, occupational, or school functioning. A person who scores in this range may have suicidal ideation, severe obsessional rituals, no friends, and may be unable to keep a job. *Diagnostic and Statistical Manual of Mental Disorders* 34 (American Psychiatric Association, 4th ed. rev. 2000).

6

concentration, persistence, or pace; and no episodes of decompensation. (Tr. 343.) On April 21, 2006, Ms. Joan Williams confirmed Ms. Chambly's assessment. (Tr. 379.)

Between 2004 and 2006, Plaintiff presented to Dr. Choong H. Kim, M.D., at the Ashtabula County Medical Center. (Tr. 226-49.) Dr. Kim reported that Plaintiff could not work because of her migraine headaches and depression. (Tr. 234.) Dr. Kim wrote a letter expressing his opinion that Plaintiff was unable to work, but Dr. Kim did not explain the basis of his opinion in the letter. (See Tr. 378.)

Between 2005 and 2007, Plaintiff saw Dr. Bruce A. Piszel, M.D. with complaints of her migraine headaches. (Tr. 288, 629.) Dr. Piszel noted that Plaintiff suffered her headaches two to three times a week. (Tr. 288.) On June 21, 2006, Dr. Piszel wrote a letter expressing his opinion that Plaintiff was unable to work because of the medication she was taking for her migraine headaches; however, Dr. Piszel did not explain in the letter how Plaintiff's medications affected Plaintiff's ability to work. (See Tr. 381.)

In October 2006, Dr. Stephen Wells completed a medical source statement indicating that Plaintiff's depression was caused by her marital problems, that Plaintiff's migraine headaches worsened with her depression, and that her headaches lasted for days at a time. (Tr. 416.) Dr. Wells indicated that, although Plaintiff was not limited in any physical capacity, her health status was deteriorating and she was unemployable for thirty days to nine months. (Tr. 416-17.)

Between 2006 and 2007, Plaintiff saw Dr. Khoa Tran, M.D., with complaints of depression and anxiety. (Tr. 579.) Dr. Tran reported that Plaintiff also suffered migraine headaches that occurred five days a week. (Tr. 579.) Dr. Tran diagnosed Plaintiff with depression, OCD, and migraine headaches, and gave Plaintiff a GAF score

7

of 61.[6] (Tr. 580.)

On March 3, 2008, Mr. Halas performed a second psychological evaluation at the request of the Social Security Administration. (Tr. 465.) Mr. Halas again assigned Plaintiff a GAF score of 45, indicated she had "significant psychological issues," and opined that Plaintiff was "not now employable." (Tr. 469.)

Between January and April 2008, Dr. Emad Mikhail treated Plaintiff at the Great Lakes Pain Management Center. (Tr. 538-57.) Dr. Mikhail indicated that Plaintiff suffered "common migraine headaches," but there were no compelling objective findings on examination. (Tr. 540; see 538-57.) Dr. Mikail indicated that Plaintiff's medications alleviated some of her symptoms (Tr. 551, 554), but that her migraine pain was "continuous" (Tr. 554), and that her condition had not changed between visits (Tr. 551).

## C. Hearing Testimony

### 1. Plaintiff's Testimony

Plaintiff testified to the following at her hearing. Plaintiff suffered disabling migraine headaches that occurred approximately three times a week and were severe enough to significantly interfere with all of her daily activities. (Tr. 659-60.) She suffered migraines since she was four years old. (Tr. 663.) She had five children, but presently lived with and cared for only her two youngest children, aged four and five.

---

[6] A GAF score between 61 and 70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning. A person who scores in this range may have a depressed mood, mild insomnia, or occasional truancy, but is generally functioning pretty well and has some meaningful interpersonal relationships. See Diagnostic and Statistical Manual of Mental Disorders, at 34.

(Tr. 653.) Her parents helped with child care when she experienced severe headaches. (Tr. 653-55.) She managed her own finances, cooked, shopped, and cleaned in addition to caring for her children. (Tr. 655-56.) She could care for herself, but only for as long as she did not suffer a migraine headache. (Tr. 659.)

Plaintiff worked part-time as a cashier at the time of the hearing, but had cut her hours back from thirty-two to between twelve and sixteen per week because of the frequency and severity of her headaches. (Tr. 649-52.) Plaintiff's migraines and medications interfered with her ability to drive and work. (Tr. 652, 54, 58.) She had to call off from work seventeen times because of her headaches, and her supervisor had to "coach" her three times. (Tr. 652.) Plaintiff also suffered OCD, which caused her to clean and check her schedule obsessively and, therefore, interfered with her daily activities. (Tr. 663.)

## 2. Vocational Expert's Testimony

The VE testified that Plaintiff's past relevant work as a shoe salesperson was light, semi-skilled work, and Plaintiff's past relevant work as a dry cleaning counter clerk was light, unskilled work. (Tr. 664.) The VE testified that Plaintiff's present, part-time work as a cashier was light, semi-skilled work. (Tr. 664.) The ALJ posed the following hypothetical person to the VE:

> Assume . . . a hypothetical individual with . . . a residual functional capacity of light work as defined in the regulations. This individual can lift and carry 10 pounds frequently, 20 pounds occasionally. This individual has no difficulty in standing, walking or sitting. This individual [cannot][7] work at

[7] This part of the ALJ's hypothetical to the VE was inaudible to the court reporter but, as it is presented here, is consistent with the ALJ's RFC determination in his Decision. (See Tr. 25.)

> unprotected heights or around dangerous machinery. This individual cannot be exposed to extreme temperatures. This individual is limited to low stress, simple, repetitive job tasks.

(Tr. 664.)  The VE testified that such a person could perform Plaintiff's past relevant work as a dry cleaner counter clerk. (Tr. 664, 665.)  The ALJ then clarified that Plaintiff's past work as a dry cleaner counter clerk did not qualify as past relevant work because it was not performed on a full-time basis. (Tr. 665-66.)

The VE further testified that such a person could perform work as a light office helper, of which there were 9,800 jobs locally and 260,000 nationally; as a light, unskilled cashier, of which there were 6,270 jobs locally and 165,000 nationally; and as a light, unskilled cafeteria attendant, of which there were 5,900 jobs locally and 155,000 nationally. (Tr. 664-65.)

The ALJ then offered a modified hypothetical person who was able to work only two to three days a week. (Tr. 666.)  The VE testified that such a person would not be able to perform any work in the national economy. (Tr. 666.)

Finally, the ALJ offered a modified hypothetical person who had a marked inability to work with the public. (Tr. 666.)  The VE testified that such a limitation would preclude the cashier job and cafeteria attendant job, and would reduce the number of officer helper jobs by half (to 4,900 locally and 130,000 nationally). (Tr. 666-67.)

The VE testified that his testimony was consistent with the Dictionary of Occupational Titles. (Tr. 665.)

### III.    STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when she establishes disability within the meaning of the Act. 20 C.F.R. § 416.905; *Kirk v. Sec'y*

10

*of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a). To receive SSI benefits, a recipient must also meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. 20 C.F.R. §§ 404.1520(b) and 416.920(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) and 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d). Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national

11

economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), and 416.920(g).

## IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant has not engaged in substantial gainful activity since August 19, 2005, the application date.

2. The claimant has the following severe impairments: migraine headaches, depression and a generalized anxiety disorder with features of obsessive-compulsive disorder (OCD).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments.

4. After careful consideration of the entire record, the undersigned find that the claimant has the residual functional capacity to perform light work. . . . The claimant has no limitations for sitting, standing or walking in an eight (8) hour workday. She has mostly no postural limitations with the exception that she is not to perform any climbing regarding work activity. She is capable of understanding, remembering, and carrying out simple instructions and performing simple, routine and repetitive tasks as consistent with unskilled work activity. She is to avoid exposure to hazardous situations that might cause harm to self or others such as work at unprotected heights or work with dangerous machinery. The claimant is to perform work in a low stress environment. Due to the possibility of triggering a headache, the claimant is to avoid work environments that would expose her to extremes of temperature. The claimant has no significant communicative, social, manipulative, or visual limitations. She has minimal environmental limitations as noted. The claimant is able to perform sustained work activity on a regular and continuous basis for eight hours per day, forty hours a week with normal breaks being sufficient.

5. The claimant is unable to perform any past relevant work.

. . . . .

8. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework

12

supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

9.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in the national economy that the claimant can perform.

10. The claimant has not been under a disability, as defined in the Social Security Act, since August 19, 2005, the date the application was filed.

## V.   LAW & ANALYSIS

### A.   Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence, and whether it was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010). Review must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ. *Id.* However, the court does not review the evidence *de novo*, make credibility determinations nor weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as

13

adequate to support a conclusion. _Brainard, 889 F.2d at 681_.

### B.    The ALJ's Discussion of the Record Evidence

Plaintiff essentially argues that the ALJ failed to meet the requirements of the Social Security Rulings by failing to articulate the basis of his Decision with sufficient specificity to make clear to subsequent reviewers the weight he gave to the record evidence.  In particular, Plaintiff takes issue with the ALJ's discussion of Plaintiff's credibility regarding her allegations of disabling pain and other symptoms, the ALJ's discussion of the medical source evidence, and the ALJ's consideration of Plaintiff's part-time job as evidence of an ability to work.

An ALJ's decision must contain specific reasons for his findings on a claimant's credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the claimant and to any subsequent reviewers the weight the ALJ gave to the claimant's statements and the reasons for that weight. S.S.R. 96-7p, 1996 WL 374186, at *2.  The decision must also contain specific reasons for the weight given to the treating sources' medical opinions, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight given to the treating sources' medical opinions and the reasons for that weight. S.S.R. 96-2p, 1996 WL 374188, at *5.

Here, although the ALJ's factual recitation in his Decision is fairly detailed, the ALJ's entire analysis of Plaintiff's pain and credibility is set forth in only one paragraph:

> It bears reiteration of the claimant's Function Report documents that she performs household chores, cares for five children, drives, shops and handles her finances . . . .  These activities of daily living are extensive and belie the alleged disabling nature of her migraine headaches. Additionally, as reported by Dr. Mikhail and Dr. Piszel, the claimant's medications have

14

> provided relief from her migraine headaches. In light of the above evidence, the undersigned determines that based on the lack of objective and clinical data to support the degree of work disabling pain and limitations alleged by the claimant, the medical evidence does not show medically determinable impairments that could reasonably result in the pain and dysfunction alleged by the claimant.

(Tr. 32-33.) This analysis is conclusory, as discussed in more detail below. To the extent the Commissioner argues that facts support the ALJ's conclusion, such arguments are *post hoc* rationalizations that were never explained by the ALJ in his Decision.

Plaintiff was diagnosed with migraine headaches and was routinely medicated for her migraine pain; her statements of pain were consistent throughout her entire case record; and five medical sources determined that Plaintiff was disabled or otherwise unable to work.[8] The ALJ explained, however, that there was a lack of objective and clinical data to support the degree of Plaintiff's alleged work-disabling pain caused by her migraines. Although this would be an appropriate finding, and the determination of disability is ultimately reserved to the Commissioner, a lack of objective clinical data is insufficient on its own to establish that a claimant's allegations of disabling pain are not credible.[9] An ALJ must consider other factors that may or may not corroborate a claimant's allegations of disabling pain. *See Felisky v. Bowen*, 35 F.3d 1027, 1039 (6th Cir. 1994); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997); S.S.R.

---

[8] Dr. Lyons opined that Plaintiff was "disabled." Drs. Kim and Piszel opined that Plaintiff was "unable to work." Dr. Stephen Wells and Mr. Halas opined that Plaintiff was "unemployable."

[9] Indeed, it is unclear whether there could ever be objective clinical evidence of a claimant's alleged migraine headache pain.

96-7p, at *3.  Such other factors include statements from the plaintiff and the plaintiff's

treating and examining physicians; diagnosis; efforts to work; plaintiff's daily activities;

the location, duration, frequency, and intensity of the symptoms; precipitating and

aggravating factors; the type, dosage, effectiveness, and side effects of any medication

taken to alleviate the symptoms; treatment, other than medication, the plaintiff receives

to relieve pain; measures used by the plaintiff to relieve symptoms; and any other

factors concerning functional limitations due to symptoms.  See Felisky, 35 F.3d at

1039-40; 20 C.F.R. §§ 404.1529(a), (c)(3), 416.929(a), (c)(3); S.S. R. 96-7p, at *3.

      Here, it is not clear how Plaintiff's daily activities were inconsistent with her

alleged disabling migraine headache pain.  The ALJ explained that Plaintiff's ability to

perform daily household chores, care for five children, drive, shop, and handle finances

were "extensive" and belied Plaintiff's allegations of disabling pain.  (Tr. 30.)  Plaintiff's

daily activities, however, were not necessarily inconsistent with her allegations.  See,

e.g., Walston v. Gardner, 381 F.2d 580, 586 (6th Cir. 1967) (explaining that the ability to

perform basic daily activities such as driving, shopping for groceries, washing dishes,

and sweeping the floor are not necessarily indicative of an ability to perform substantial

gainful activity because such activities are intermittent and can be performed while

suffering pain); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989) (explaining that

the claimant's ability to live alone, care for her children, cook, clean, shop for groceries,

do laundry, visit with friends, attend church, and go fishing did not necessarily indicate

that the claimant was capable of performing substantial gainful activity); Hall v.

Celebrezze, 314 F.2d 686, 690 (6th Cir. 1963) ("It was not necessary that [the claimant]

be bedridden or wholly helpless in order to establish his claim for benefits.").  Indeed,

16

Plaintiff testified that she could care for herself only as long as she did not suffer a migraine, that she suffered dysfunction from her migraines two to three times a week, and, when she suffered migraines, her parents took care of her children. The ALJ should have explained how these daily activities, in light of Plaintiff's alleged limitations, were inconsistent with being disabled at least three days a week.

The ALJ's assessment of the medical source evidence is also not clear. Although the ALJ noted that the objective medical findings upon examination of Plaintiff were relatively unremarkable, providing such findings as a "normal neck examination," with "no edema of her extremities," and "5/5 motor strength of her bilateral upper and lower extremities" (Tr. 32), there is no explanation of how such findings were inconsistent with Plaintiff's allegations of disabling migraine headache pain. In fact, it is unclear how such findings even relate to Plaintiff's migraines, and the ALJ did not rely on a medical expert provide insight on the matter. *See Buxton v. Halter,* 246 F.3d 762, 775 (6th Cir. 2001) (explaining that an ALJ may rely on a non-examining medical expert to make sense of the record evidence).

The ALJ also noted that two medical sources, Drs. Mikhail and Piszel, found that Plaintiff's medications provided Plaintiff with some relief from her migraine pain. It is not clear how these observations are inconsistent with the allegedly disabling nature of her migraines. Dr. Mikhail indicated that Plaintiff's complaints of migraine pain were continuous and did not improve between her visits, and Dr. Piszel found Plaintiff disabled in part *because of* the medications she was taking. These medical observations undermine the conclusion that Plaintiff's medications successfully mitigated Plaintiff's migraine headache pain such that Plaintiff was not disabled by it,

17

and it is not clear whether the ALJ reconciled this conflicting evidence.

Furthermore, although the ALJ gave Dr. Esper's medical opinions "significant weight" (Tr. 33), the ALJ never otherwise mentioned Dr. Esper in the Decision. It is not clear, therefore, what aspects of Dr. Esper's opinions were given weight and why they were given weight.

Just as disconcerting as the lack of specificity and clarity in the ALJ's Decision is the ALJ's failure to discuss evidence that detracted from the conclusion that Plaintiff was not disabled. For example, the ALJ did not discuss Dr. Stephen Wells' opinions, which included the observations that Plaintiff suffered migraine headaches several times a week and was unemployable. Moreover, although the ALJ noted that Plaintiff had been working thirty hours a week at a retail store to support his conclusion that Plaintiff was able to work (Tr. 22, 24, 31, 33), the ALJ did not mention Plaintiff's testimony that Plaintiff had to cut her hours to between twelve and sixteen a week because of the frequency and severity of her headaches. This evidence was particularly relevant to whether Plaintiff was disabled because the VE testified that there would be no substantial, gainful employment in the national economy for a person who could work only two to three days a week. In light of the absence of this countervailing evidence as it relates to the VE's testimony, it is not clear how Plaintiff's allegations of disability were inconsistent with the record evidence and, consequently, were incredible.

Although we do not agree with all of Plaintiff's characterizations of her symptoms and limitations, we do agree that the ALJ failed to adequately articulate his assessment of the record evidence. The ALJ's Decision is not sufficiently specific and clear to enable this Court to evaluate whether the ALJ had an adequate basis for his

18

determination.  Remand is necessary so that the ALJ may make clear whether there is

such an adequate basis for his determination.

## VI.    CONCLUSION

· For the foregoing reasons, the Magistrate Judge recommends that the final

decision of the Commissioner be VACATED and REMANDED.


*s/ Nancy A. Vecchiarelli*
Nancy A. Vecchiarelli
U.S. Magistrate Judge


Date: December 8, 2010



## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of this notice.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).**